UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-12378-GAO

KIERAN O'HARA, on behalf of himself and all others similarly situated,
Plaintiff,

v.

THE STANDARD FIRE INSURANCE COMPANY
d/b/a TRAVELERS INSURANCE COMPANY,
Defendant.

ORDER ON REPORT AND RECOMMENDATION
March 30, 2018

O'TOOLE, D.J.

The magistrate judge to whom the defendant's Motion for Judgment on the Pleadings (dkt. no. 9) was referred has filed a Report and Recommendation ("R&R") recommending that the motion be denied as to Count II and granted as to Counts I and III through VII. Both parties have filed timely objections to the R&R.

Having reviewed the magistrate judge's recommendation and the relevant submissions of the parties, I approve and ADOPT the R&R to the extent that it recommends dismissal of Counts I and III through VII.[1] I conclude, however, that the defendant is also entitled to dismissal of Count II.

The plaintiff, a self-employed individual, contends that the defendant, his automobile insurance company, failed to pay him the full amount of benefits to which he was entitled to compensate him for five days of lost income resulting from a personal injury. Of particular

_____

[1]Count I can be dismissed on the ground that there has been no statutory violation based upon the findings in this Order.

relevance to the parties' dispute is the following standard policy language related to Personal Injury Protection ("PIP"):

> If an injured person is out of work because of the accident, we will pay lost wages up to 75% of his or her *average weekly gross wage or equivalent* for the year ending on the day immediately before the accident. We will not pay for the loss of any other type of income.

(Def. Mem. of Law, Ex. A at 4 (emphasis added) (dkt. no. 10-1).)

The PIP provision is mandated by and adapted from Massachusetts' "no-fault" automobile insurance law. <u>See</u> Mass. Gen. Laws ch. 90 §§ 34A, 34M; <u>Ortiz v. Examworks, Inc.</u>, 26 N.E.3d 165, 169 (Mass. 2015); <u>DiGiacomo v. Metro. Prop. & Cas. Ins.</u>, 847 N.E.2d 1107, 1109 (Mass. App. Ct. 2006). "No-fault insurance was designed to afford claimants 'the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses'" in exchange for the "surrender of 'the possibly minimal damages for pain and suffering recoverable in cases not marked by serious economic loss or objective indicia of grave injury.'" <u>DiGiacomo</u>, 847 N.E.2d at 1112 (quoting <u>Pinnick v. Cleary</u>, 271 N.E. 2d 592, 597 (Mass. 1971)). Through its enactment, the legislature intended to "reduce the amount of motor vehicle tort litigation, control the costs of automobile insurance, and ensure prompt payment of claimants' medical and out-of-pocked expenses." <u>Ortiz</u>, 26 N.E.3d at 170 (quoting <u>Fascione v. CAN Ins. Cos,</u>, 754 N.E.2d 662, 667 (2001). PIP is an "essential component" of the law, designed to "facilitate, through PIP payments, the claimant's prompt receipt of 'the major portion of his lost wages not covered by a wage continuation plan.'" <u>DiGiacomo</u>, 847 N.E.2d at 1112 (quoting <u>Pinnick</u>, 271 N.E.2d at 598).

The statute provides that PIP benefits are to include payment for "persons employed or self-employed at the time of an accident of any amounts actually lost by reason of inability to work and earn wages or salary or their equivalent, but not other income, that would otherwise have been

earned in the normal course of an injured person's employment." Mass. Gen. Laws ch. 90 § 34A. It goes on to explain that:

> payments for loss of wages or salary or their equivalent . . . shall be limited . . . (2) in the case of persons not entitled to wages or salary or their equivalent under any program for continuation of said wages or salary or their equivalent to an amount that will provide seventy-five percent of any such person's average weekly wage or salary or its equivalent for the year immediately preceding the accident.

Id. It further provides that when claiming benefits under the PIP provision, "[i]f benefits for loss of wage or salary, or in the case of the self-employed their equivalent, are claimed the party presenting such a claim shall authorize the insurer to obtain details of all wage or salary payments, or their equivalent, paid to him by any employer in the year immediately preceding the date of accident, or earned by him." Id. § 34M.

The PIP policy, read together with the relevant statute, provides that claimants who are self-employed at the time of an accident—i.e., those who do not actually receive a set wage or salary—are entitled to the "equivalent" of a wage earned by employees. The issue before the Court is how to calculate the "equivalent" for the self-employed plaintiff. The defendant insurer contends that the calculation should be based upon his "net profit" listed on Line 31 of his Form 1040 Schedule C reporting business earnings, whereas the plaintiff argues it should be based on the "gross income" in Line 7. In this case, the plaintiff's gross business income for the relevant time period was $68,358. After deducting business expenses other than any payment to himself, his net profit was $31,311. Seventy-five percent of average weekly gross income would have totaled $985.93, whereas 75% of his average weekly net profit as calculated by the defendant was $451.60.

The "net profit" for someone who is self-employed is the amount of funds available to him after his business expenses are subtracted from the business' overall "gross income" and before any taxes, retirement contributions, and insurance contributions are paid. On the Schedule C, a self-employed individual describes the "gross income" of his business on Line 7. He then enters

various applicable business expenses, such as advertising, car and truck expenses, contract labor, office expenses, repairs and maintenance, travel, meals, and entertainment. He then deducts these business expenses from his business' gross income to determine the "net profit" of the business as entered on Line 31. From that amount, he deducts health insurance premiums, the deductible amount of self-employment taxes, and retirement contributions.

It follows then that the "net profit" of a self-employed individual's business is the rough equivalent of an employee's gross wages on the form on which both parties rely to interpret compensation under the PIP policy. It is the best approximation of the earnings that are actually available to the *individual*—not the business—before standard deductions like taxes, retirement contributions, and health insurance are taken into account. That is generally also how an employee's salary or wage is understood. It is what is earned by the individual for his labor or services; it is not the amount that reflects an entire business entity's earnings before any of its costs or expenses are considered.

This interpretation avoids the absurd result of possible windfalls by self-employed claimants. The plaintiff's interpretation would give him an unfair advantage over regular employees because it would allow him to collect benefits based upon the entire gross income of his business when only a portion of that figure is available to him for his personal use. For instance, consider a business that has a gross income of $500,000 and $450,000 of that gross income goes to paying business expenses, leaving the owner $50,000 upon which to live. PIP is plainly intended to provide insurance coverage for the $50,000, not the total gross income of $500,000, just as it would compensate an employee with a salary of $50,000 based on that $50,000, regardless of what his employer's gross income is. To compensate the owner based on the $500,000 figure would result in a vast discrepancy between his compensation and the amount the employee who earned

$50,000 would receive under PIP in conflict with the provision that self-employed individuals receive benefits equivalent to those who earn a wage or salary. Nothing in the PIP policy or the statute upon which it is based suggests that self-employed individuals should be entitled to this advantage.

In sum, for the purposes of this case, the net profit that the plaintiff earned as a self-employed insured is equivalent to the gross wage of a regular employee. The defendant correctly compensated the plaintiff seventy-five percent of his net profit for the year preceding his accident.

The defendant's objection to the R&R is therefore sustained and the plaintiff's objections to the R&R are overruled. The defendant's Motion for Judgment on the Pleadings (dkt. no. 9) is GRANTED in full.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

KIERAN O'HARA, on behalf of
himself and all others
similarly situated,

  Plaintiff,

v.

THE STANDARD FIRE INSURANCE
COMPANY, d/b/a TRAVELERS
INSURANCE COMPANY

  Defendant.

No. 16-cv-12378-GAO

## REPORT AND RECOMMENDATION ON DEFENDANT'S
## MOTION FOR JUDGMENT ON THE PLEADINGS (Dkt. No. 9)

CABELL, U.S.M.J.

  Kieran O'Hara ("O'Hara" or "the plaintiff") contends that his
insurance company, Standard Fire Insurance Company ("Standard
Fire" or "the defendant"), failed to pay him the full amount of
benefits he was entitled to under a policy providing for payment
of an insured's average weekly "gross wages" to compensate for
lost income due to personal injury. O'Hara alleges breach of
contract and violation of M.G.L. c. 93A among other claims. The
principal issue concerns the meaning of the phrase "gross wages"
as it pertains to individuals like O'Hara who are self-employed.
O'Hara contends that the phrase means "gross income." Standard
Fire contends that the phrase means "net profit" and it moves for

a judgment on the pleadings on the ground that it did not breach the policy when it calculated O'Hara's insurance benefits based on his "net profit" rather than "gross income." (Dkt. No. 9). As discussed below, I recommend that the motion for judgment be denied with respect to O'Hara's breach of contract claim but granted with respect to all other claims.

## I.  RELEVANT BACKGROUND

### A. **The Amended Complaint**

As alleged in the amended complaint, O'Hara was injured in an automobile accident and missed five days of work. (Am. Compl. ¶¶ 6, 8, 10). O'Hara's vehicle was insured by Standard Fire pursuant to an automobile policy (hereinafter "policy") which among other things provided for benefits for lost wages due to injury from an automobile accident. (Id. ¶ 7). Under the "Personal Injury Protection" ("PIP") provisions of the policy:

> If an injured person is out of work because of the accident, [Standard Fire] will pay lost wages up *to 75% of [the insured's] average weekly gross wage or equivalent* for the year ending on the day immediately before the accident. [Standard Fire] will not pay for the loss of any other type of income. If the injured person was unemployed at the time of the accident, [Standard Fire] will pay up to 75% of the amount [the insured] lost in earning power as a result of the accident.

(Id. ¶ 20); Dkt. No. 10-1 (emphasis added).

Pursuant to the PIP provisions, O'Hara presented a claim to Standard Fire for lost wages for the five days he was unable to

work.  (Am. Compl.  ¶ 11).  As part of his claim, O'Hara provided Standard Fire with copies of his 2015 federal tax returns and a disability statement from his physician.  (Id. ¶ 14). Based on the supporting documentation, Standard Fire concluded that O'Hara was eligible for lost wage payments in the amount of $451.59.  (Id. ¶ 16).  In a contemporaneous letter to O'Hara's attorney, Standard Fire indicated that "in reviewing the tax documents for the los[t] wages, under the [PIP] coverage we consider the net profit amount and not the gross profit amount."  (Id. ¶ 17).

There is no dispute that O'Hara was at all relevant times self-employed as the sole proprietor of his personal business. O'Hara took issue with Standard Fire's methodology for determining his benefits.  He alleges that, based on his yearly gross earnings, 75% of his average weekly gross wages totaled $985.93 rather than $451.59.  (Id. ¶ 37).  He contends that Standard Fire's methodology contravened the explicit terms of the insurance policy where Standard Fire based the plaintiff's benefits on his "net profits" rather than on his "gross wages."  (Id. ¶ 21).

The complaint contains seven counts:  Count I alleges violations of M.G.L. c. 90, §§ 34A and 34M; Count II alleges breach of contract; Count III alleges a violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 2; Count IV alleges a chapter 93A violation based on a violation of M.G.L. c. 176D, § 3(9)(f); Count V alleges a chapter 93A violation based on a

violation of M.G.L. c. 176D, § 3(9)(n); Count VI alleges a chapter 93A violation based on a violation of 940 CMR 3.16 and M.G.L. c. 90, §§ 34A and 34M; and Count VII seeks a declaratory judgment that Standard Fire did not breach a contract or violate any pertinent statutes.

O'Hara seeks also to obtain class action status on behalf of all similarly situated individuals.

### B. **Procedural History**

O'Hara commenced the lawsuit by filing a three-count complaint in the Massachusetts Superior Court, alleging violations of M.G.L. c. 90, §§ 34A and 34M, and breach of contract, and subsequently amended the complaint to include several chapter 93A based claims. (Dkt. No. 1-1). On November 22, 2016, Standard Fire removed the case to federal court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). (Dkt. No. 1). Shortly thereafter, Standard Fire moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. No. 9). O'Hara opposes. (Dkt. No. 12).

## II. LEGAL STANDARD

Under Rule 12(c) of the Federal Rules of Civil Procedure, "after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Although a Rule 12(c) motion for judgment on the pleadings considers the factual allegations in both the complaint

4

and the answer, it is governed by the same standard as a Rule 12(b)(6) motion to dismiss." *Keenan v. Wells Fargo Bank, N.A.*, No. 16-10653-NMG, 2017 WL 1197741, at * 2 (D. Mass. Mar. 30, 2017)(*citing Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008)).

To survive a Rule 12(b)(6) motion to dismiss, the complaint must include sufficient factual allegations that, when taken as true, demonstrate a plausible claim of relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-58 (2007). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(*quoting Twombly,* 550 U.S. at 556)). The "plausibility" standard requires the court to: (1) distinguish between the complaint's factual allegations, which must be accepted as true, and its conclusory legal allegations which are afforded no credence, and (2) determine whether the factual allegations "are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." *Garcia-Catalan v. U.S.,* 734 F. 3d 100, 103 (1st Cir. 2013)(*quoting Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

However, unlike a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings "implicates the pleadings as a whole." *Boston Taxi Owners Association, Inc. v.*

*City of Boston*, No. 15-10100-NMG, 2016 WL 7410777, at * 2 (D. Mass. Dec. 21, 2016). Therefore, aside from the complaint, the court may also consider additional documents if "(1) the parties do not dispute their authenticity, (2) they are central to the plaintiff's claim, or (3) they are sufficiently referred to in the complaint." *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007).

## III. ANALYSIS

### A. Count II – Breach of Contract

O'Hara's principal claim is that Standard Fire breached its agreement under the insurance policy to pay him a percentage of his weekly gross wages. O'Hara argues that the explicit language of the policy entitled him to receive 75% of his "average weekly gross wages" and that Standard Fire breached its obligations when it calculated his benefits as a self-employed individual based on his "net profit." Standard Fire argues that its methodology is consistent both with the provisions of the policy and applicable Massachusetts law.

Massachusetts law requires automobile insurance companies underwriting policies in Massachusetts to provide certain PIP benefits. Pursuant to M.G.L. c. 90, § 34A, these benefits must include:

> any amounts actually lost by reason of inability
> to work and earn wages or salary or their
> equivalent, but not other income, that would
> otherwise have been earned in the normal course of
> an injured person's employment

6

M.G.L. c. 90, § 34A.

The relevant portion of Standard Fire's automobile policy, which presumably is meant to incorporate the requirements of section 34A, provides that:

> if an injured person is out of work because of [an] accident, [Standard Fire] will pay lost wages up to 75% of [the insured's] average weekly *gross wage or equivalent* for the year ending on the day immediately before the accident

(Am. Compl. ¶ 20)(emphasis added).

Thus, Standard Fire generally tracks the pertinent Massachusetts statute in its policy but notably adds the word "gross," a word which does not appear in the statute. Accordingly, whereas section 34A instructs that an insurance company must compensate an insured for their "wages, salary or their equivalent," Standard Fire's policy provides that it will compensate an insured for his "*gross* wage[s] or equivalent."

At all relevant times, O'Hara was self-employed as the sole proprietor of his personal business. Based on his 2015 federal tax return, specifically Line 7 of the Form 1040 Schedule C, O'Hara received a "gross income" of $68,358. (Id. ¶ 32). When calculated on a weekly basis and then reduced to 75% per the policy, that amount translates into an average weekly gross income of $985.93. To O'Hara, then, $985.93 literally represented 75% of his average weekly "gross" income and that is what he contends he should have received.

Standard Fire calculated the plaintiff's benefits differently. It contends that the closest analog for a self-employed individual's gross income is not his "gross income" at Line 7 on Schedule C, but rather his "net profits" at Line 31. Standard Fire argues that a self-employed individual's net profit is equivalent to an employee's "wages or salary" because it is equivalent to the amount that the self-employed individual would receive if he or she was an employee. Here, Standard Fire calculated that O'Hara's net profit calculated on a weekly basis came to $451.59 and accordingly based his proceeds on that amount.

In essence, then, the difference between the parties is that O'Hara reads the phrase "gross wages" quite literally as a static term that exists independent of one's employment status. Standard Fire, in contrast, reads the phrase as a relative term whose meaning may differ depending on one's employment status. O'Hara contends that the defendant breached the policy when it applied its interpretation of the phrase and paid him proceeds based on his net profit rather than his gross income.

A court's first step in evaluating a breach of contract claim is to determine whether the relevant contract provision is ambiguous. *Barclays Bank PLC v. Poynter*, 710 F.3d 16, 21 (1st Cir. 2013). Whether a contract is ambiguous is a question of law for the court to decide. *See Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 53 (1st Cir. 2001). "To answer the ambiguity

question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Consolo v. Bank of America*, No. 15-11840, 2017 WL 1739171, at * 3 (D. Mass. May 2, 2017)(*quoting Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008)). "An agreement is not ambiguous merely because a controversy exists between the parties, each favoring an interpretation contrary to the other, or because a word has multiple dictionary definitions." *PhoneDOCTORx, LLC v. Healthbridge Management, Inc.*, 58 F. Supp. 3d 152, 160 (D. Mass. 2014) (*quoting Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998)). Rather, "[a] contract is ambiguous if an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Local 369 Utility Workers v. NSTAR Elec. and Gas Corp.*, 317 F. Supp. 2d 69, 73 (D. Mass. 2004); *see also Henry v. National Geographic Society*, 147 F. Supp. 2d 16, 19 (D. Mass. 2001)("Under Massachusetts law, a contract term is ambiguous where its language is reasonably prone to different interpretations or susceptible to differing, but nonetheless, plausible constructions."). "If the contractual language is ambiguous, a fact finder must resolve the ambiguity by considering the factual evidence offered by the parties to support

their differing interpretations." *Id.* at 20 (*citing Lanier Prof. Serv., Inc. v. Ricci*, 192 F.3d 1, 4 (1st Cir. 1999).

To this court, the meaning of the phrase "gross wages" in the policy is ambiguous. As a threshold matter, the insurance policy does not define "gross wages" and neither party cites to any other portion of the policy as providing meaningful guidance as to its meaning. As such, the meaning of the phrase is not apparent whether one reads it in isolation or attempts to reason its meaning in the context of the policy as a whole. Similarly, while Standard Fire urges that "gross wages" must mean "net profit" when referring to a self-employed insured, that conclusion is just not self-evident from the policy itself; indeed, the policy does not distinguish at all between employed or self-employed insureds.

Where a contract's terms are ambiguous, judgment is appropriate "only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary. *See Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1988) (internal quotation marks and citations omitted). Here, the parties point collectively to the Massachusetts statute mandating the coverage at issue, as well as the IRS Form 1040, Schedule C. In the court's view, neither piece of evidence unequivocally resolves the ambiguity over the meaning of the phrase "gross wages."

10

With respect to the statute, M.G.L. c. 90, § 34A does mandate that an insurer provide protection for lost wages, but the statute as noted above does not include the word "gross." Rather, Standard Fire added that word when it incorporated section 34A into a policy. One can reasonably debate whether Standard Fire meant to import the meaning of the word "wage" as it is used in the statute or alternatively meant to alter or modify the meaning by adding the word "gross," but the court is just not in a position to definitively answer that question. Consequently, the statute is not instructive in trying to divine the meaning of the phrase "gross wages" in the context of the policy.

Aside from the statute, both parties rely on different portions of the Schedule C tax form to support their competing positions. O'Hara contends that Line 7 of Schedule C explicitly refers to a self-employed's *gross* income, suggesting that the amount he listed on that line should be the amount used to calculate his gross wages under the policy. In contrast, Standard Fire argues that Line 31's reference to "net profit" comes the closest to equating what would be an employed insured's gross wages. To the court, both positions are principled, even assuming that one argument might have more persuasive force than the other.

To be sure, Standard Fire argues that O'Hara's interpretation would defy "common sense" and "lead[] to anomalous results." Standard Fire notes that under the plaintiff's interpretation, a

self-employed insured whose business grossed $1 million in revenue but only $100,000 in profit would receive far more than an otherwise similarly situated employed insured who earned $100,000 per year. This argument does have some appeal but the court does not find it dispositive here. First, while it is reasonable to presume that Standard Fire would not in a vacuum intend to create a windfall for self-employed insureds, Massachusetts law caps the amount of proceeds that an insured may receive at $8,000, so wildly anomalous results are unlikely to occur with great frequency. *See* M.G.L. c. 90, § 34A. Moreover, the defendant's own interpretation that "gross wages" must mean "net profit" for self-employed insureds could also if endorsed potentially lead to anomalous results. If, for example, a self-employed insured regularly paid himself a weekly wage of $1,000 but ultimately in a given year operated the business at a net loss, say because of some costly one-time event at the end of the year, he would by virtue of Line 31 have no "net profit" and for that reason might be deemed to be ineligible for compensation.

In sum, the court finds that the meaning of the phrase "gross wages" in the defendant's insurance policy is ambiguous because it is reasonably prone to different interpretations or susceptible to differing, but nonetheless, plausible constructions. There is some extrinsic evidence but that evidence is neither very probative nor susceptible of only one interpretation. Understanding that

discovery may yield additional information bearing on this issue, the better course would be to allow the claim to go forward and address this issue later when the record is more developed. The motion for judgment on the pleadings should therefore be denied with respect to Count II. *See NexTT Solutions, LLC v. XOS Technologies, Inc.,* 113 F. Supp. 2d 450, 458 (D. Mass. 2015) (denying defendant's motion to dismiss breach of contract claim where contract was ambiguous as to meaning of the phrase "minimum revenue term"); *Samia Companies LLC v. MRI Software LLC*, 898 F. Supp. 2d 326, 336-40 (D. Mass. 2012) (denying motion to dismiss breach of contract claim where parties disagreed on the meaning of the phrase "licensed programs," contract did not otherwise define the term, and parties would need "an opportunity to develop the factual record"); *Oggiono v. Fabmet Corp.,* No, 02-12595-Z, 1993 WL 328100, at *2 (D. Mass. 1993) (dismissal of breach of contract claim "inappropriate" where contract was ambiguous as to "thirty-day notice" provision and whether period began to run upon "mailing or receipt" of termination notice); *see generally Grant v. Target Corporation*, 126 F. Supp. 3d 183, 189 (D. Mass. 2015) (denying motion to dismiss breach of contract claim where discovery would be needed to resolve material facts as to its meaning); *Iron Mountain Inc. v. Carr*, No. 05-10890-RCL, 2006 WL 6602266, at * 4-5 (D. Mass. 2006) (denying motion to dismiss breach of contract counterclaim as "premature" where additional discovery needed to

interpret its terms); *Beebe v. Williams College*, 430 F. Supp. 2d 18, 23 (D. Mass. 2006) (same).

## B. Count I – Violation of M.G.L. c. 90, §§ 34A and 34M

Count I alleges that Standard Fire's failure to compensate the plaintiff for lost wages consistent with its PIP provisions violates M.G.L. c. 90, §§ 34A and 34M. Section 34M among other things requires insurance companies that underwrite motor vehicle policies to provide certain personal injury protection benefits. Section 34A by contrast merely defines terms that are used in sections 34A to 34N. Standard Fire argues that Count I fails because section 34M does not create a private cause of action. The court agrees.

Courts have consistently held that § 34M does not create a private cause of action; rather, the Massachusetts Legislature intended that a dispute arising from alleged violations of section 34M be brought as a common law breach of contract action. *See Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group*, 469 Mass. 800, 805-06 (2014)("Given these unambiguous statutory references to actions in contract, we have held that § 34M suit brought to procure unpaid PIP benefits is governed generally by ordinary contract principles."); *Boehm v. Premier Ins. Co.*, 446 Mass. 689, 691 (2006) ("Had the Legislature intended to treat contract actions brought pursuant to § 34M differently from the ordinary contract action, it could have said so explicitly

. . .").  Moreover, the plaintiff conceded at the hearing on the defendant's motion that any alleged violations of section 34 must be brought as breach of contract claims.  Judgment therefore should be entered in the defendant's favor on Count I.

### C. Counts III-VI – The Chapter 93A Claims

Counts III-VI allege violations of M.G.L. c. 93A based on several grounds.  Count III alleges a violation of chapter 93A based on the defendant's allegedly unfair and deceptive conduct. Counts IV and V allege that the defendant violated M.G.L. c. 176D, §§ 3(9)(f) and (9)(n), respectively, and that a violation of chapter 176D constitutes a per se violation of chapter 93A.[1] Finally, Count VI alleges that the defendant automatically violated chapter 93A where it also violated 940 CMR 3.16, which purports to summarize the type of conduct that can constitute a violation of chapter 93A, and M.G.L. c. 90, §§ 34A and 34M.

All of the claims appear to be predicated on the same set of facts, namely that: (1) on or about September 6, 2016, O'Hara tendered a demand letter to Standard Fire on behalf of himself and the putative class; (2) Standard Fire failed to make a reasonable settlement offer; (3) O'Hara continued to be responsible for

---

[1] M.G.L. c. 176D *et seq* generally pertains to unfair and deceptive acts and practices in the business of insurance.  More specifically, an unfair or deceptive act or practice includes, among other things, an insurance company's failure to "effectuate prompt, fair, and equitable settlements of claims," M.G.L. c. 176D, § 3(9)(f), or a failure to "provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim," M.G.L. c. 176D, § 3(9)(n).

business expenses, employee benefits, and office expenses for the five days he missed work due to injury; (4) that Standard Fire's liability to tender payment in the amount of 75% of O'Hara's gross wages was "reasonably clear" upon receipt of O'Hara's tax documents; and (5) that Standard Fire effectuated a payment for lost wages less than 75% of his gross wages without providing an explanation for doing so. (Am. Compl. ¶¶ 161-169, 175).

As an initial matter, O'Hara fails to cite any authority to support his assertion that a violation of the referenced statutes and regulation constitutes a per se violation of chapter 93A. In fact, courts have rejected this claim and have held that a plaintiff must in all instances prove unfair or deceptive conduct in order to show a violation of chapter 93A. *See e.g., M. DeMatteo Const. Co. v. Century Indem Co.,* 182 F. Supp. 2d 146, 161-62 (noting that a violation of M.G.L. c. 176D is not a per se violation of chapter 93A; rather, conduct in violation of the chapter 176D must also be unfair or deceptive within the meaning of chapter 93A); *Kiewr Const. Co. v. Wetchester,* 878 F. Supp. 298, 301 (D. Mass. 1995) (same); *see generally In Re Pharmaceutical Industry Average Wholesale Price Litigation,* 491 F. Supp. 2d 20, 82 (D. Mass. 2007) ("Courts have been hesitant to find that a violation of any statute is a per se violation of Chapter 93A, but instead take into account all the facts and circumstances to determine whether the statutory violation involves unfair or deceptive

conduct."). Thus, to the extent Counts III-VI are based on the theory that a violation of the respective underlying statutes and regulation amounts to a per se violation of chapter 93A, the counts fail to state a valid claim for relief.

In addition, Standard Fire argues that, even assuming the breach of contract claim survives, and even assuming its methodology in calculating the plaintiff's benefits were found to be incorrect, it acted in good faith and its conduct therefore does not rise to the level of a chapter 93A violation. (Dkt. No. 10).

"Chapter 93A prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . but does not itself provide standards for determining what constitutes an unfair or deceptive act . . ." *Bridge Over Troubled Waters, Inc. v. Argo Tea, Inc.*, 220 F. Supp. 3d 213, 220 (D. Mass. 2016). "To trigger liability under c. 93A, courts have said that the conduct in question must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce, . . . have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness . . ." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 217 F.3d 33, 40 (1st Cir. 2000)(internal citations omitted).

While "these traditional formulations of the standard for 93A liability are notably imprecise, a mere breach of contract does not constitute an unfair or deceptive trade practice under [section] 93A . . . unless it rises to the level of commercial extortion or a similar degree of culpable conduct." *Id.* (*citing Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (1991)); *see also Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass. 2006)(noting that "a mere breach of contract without more, does not constitute an unfair or deceptive act or practice."). In other words, "the law requires more than a mistake or honest dispute concerning the contract; [rather] some level of bad faith must be present." *Monotype Imaging Inc. v. Deluxe Corp.*, 883 F. Supp. 2d 317, 323 (D. Mass. 2012); *see also Commercial Union Ins.*, 217 F.3d at 40-41 ("An insurance carrier which in good faith denies a claim of coverage on the basis of plausible interpretation of its insurance policy is unlikely to have committed a violation of c. 93A."). Generally speaking, bad faith is shown where a party engages in "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party." *Monotype Imaging Inc.,* 883 F. Supp. 2d at 323.

Against the backdrop of this precedent, the court finds that the amended complaint does not contain sufficient factual allegations to show that Standard Fire acted in bad faith. Aside from conclusory allegations that Standard Fire's conduct

constituted "willful/knowing violations," the amended complaint is utterly devoid of any facts showing that Standard Fire intentionally calculated O'Hara's benefits in disregard of the policy, or that Standard Fire knowingly sought to shortchange self-employed insureds for its own benefit. Rather, the complaint tends to support the notion that the parties genuinely disagree as to what the term "gross wages" means in the context of calculating PIP benefits for self-employed individuals. O'Hara's stand-alone allegations that Standard Fire acted willingly and knowingly in violation of chapter 93A do not suffice to support an inference of bad faith where is it is just as plausible that Standard Fire was operating under a good faith belief in the validity of its own interpretation of the PIP provisions. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility of entitlement to relief.").

Judgment therefore should be entered for the defendant regarding Counts III-VI.

### D. Count VII - Declaratory Judgment

Count VII requests a declaration that Standard Fire "was required to pay 75% of a claimants' average weekly gross wage for time out of work as a result of an automobile accident," and that Standard Fire's method of calculating PIP benefits amounted to

violations of M.G.L. c. 90, §§ 34A and 34M, M.G.L. c. 176D, §3(9), and M.G.L. c. 93A, §2.

Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration" in cases "of actual controversy . . . upon the filing of an appropriate pleading." 28 U.S.C. § 2201(a). Federal courts "retain substantial discretion in deciding whether to grant declaratory relief." *Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 534 (1st Cir. 1995). In that regard, "[t]he key question involves the usefulness of a declaratory judgment, that is, the extent to which the desired declaration would be of practical assistance in setting the underlying controversy to rest." *United States v. NSTAR Electric Co.*, 220 F. Supp. 3d 162, 171 (D. Mass. 2016).

Since the Declaratory Judgment Act is "not an independent grant of jurisdiction . . . dismissal of the underlying claims requires dismissal of the claim for declaratory relief as well." *Tyler v. Michaels Stores, Inc.*, 840 F. Supp.2d 438, 452 (D. Mass. 2012). For that reason, assuming that judgment is entered in the defendant's favor on Counts I and III-VI as recommended, the claim for declaratory judgment would fail to the same extent.

Regardless, because O'Hara's claim for declaratory judgment merely seeks the court's affirmation that Standard Fire acted improperly as alleged in Counts I-VI, rendering a declaration would

not be of any practical assistance to clarifying the merits of his underlying claims where resolving the breach of contract claim will settle the principal legal issues. *See Penney v. Deutsche Bank National Trust Co.*, No. 16-cv-10482-ADB, 2017 WL 1015002, at *10 (D. Mass. Mar. 15, 2017)(dismissing the plaintiff's request for declaratory judgment regarding the enforceability of a contract that was duplicative of the plaintiff's breach of contract claim); *see generally, Zurich American Ins. Co. v. Watts Regulator Co.*, 796 F. Supp. 2d 240, 246 (D. Mass. 2011) (dismissing the plaintiff's declaratory judgment claim where the relief sought is repetitive of the amended complaint).

Judgment should be entered in the defendant's favor regarding Count VII.

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that the defendant's motion for judgment on the pleadings be DENIED as to Count II, and GRANTED as to Counts I, III, IV, V, VI and VII. The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis

for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: September 8, 2017